[Cite as *CAK Ventures, L.L.C. v. 1690 Timber Lake, L.L.C.*, 2023-Ohio-1926.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | |
|---|---|
| CAK VENTURES, LLC, ET AL., | JUDGES:<br>Hon. William B. Hoffman, P.J. |
| Appellant's-Cross Appellees | Hon. Craig R. Baldwin, J.<br>Hon. Andrew J. King, J. |
| -vs- | |
| | Case No. 22 CAE 06 0052 |
| 1690 TIMBER LAKE, LLC | |
| Appellee-Cross Appellant | O P I N I O N |
| and | |
| FRANK HOOK, ET AL., | |
| Appellees | |

| | |
|---|---|
| CHARACTER OF PROCEEDINGS: | Appeal from the Delaware County Court of Common Pleas, Case No. 20 CVH 02-0121 |
| JUDGMENT: | Affirmed |
| DATE OF JUDGMENT ENTRY: | June 9, 2023 |
| APPEARANCES: | |

| | |
|---|---|
| For Appellees | For Appellant Patti Gilcrest |
| GEOFFREY J. MOUL<br>Murray Murphy Moul + Basil, LLP<br>1114 Dublin Road<br>Columbus, Ohio 43215 | JOSEPH C. PICKENS<br>Isaac Wiles & Burkholder, LLC<br>2 Miranova Place, Suite #700<br>Columbus, Ohio 43215 |
| For Appellants Patti Gilcrest and<br>Yogesh Khandelwal | |
| SCOTT G. OXLEY<br>Scott G. Oxley Co., LPA<br>325 N. Main Street, Suite #204<br>Springboro, Ohio 45066 | |

*Hoffman, P.J.*

**{¶1}** Defendants-appellants/cross-appellees Yogesh and Leena Khandelwal, and Patti Gilcrest ("the Khandelwals" and "Gilcrest," individually; "Appellants," collectively) appeal the May 24, 2022 Judgment Entry entered by the Delaware County Court of Common Pleas, which granted, in part, and denied, in part, their motion for summary judgment; and granted, in part, and denied, in part, the motion for summary judgment filed by plaintiff-appellee/cross-appellant 1690 Timber Lake LLC ("1690 Timber Lake"), third-party defendants Timber Lake-Liberty LLC ("Timber Lake-Liberty") and Frank Hook. 1690 Timber Lake has filed a conditional cross- appeal from the same judgment entry.

## STATEMENT OF THE FACTS AND CASE

### The Lake and the Lake Restrictions

**{¶2}** Timber Lake ("the Lake"), which is located in Liberty Township, Delaware County, Ohio, was formed by the installation of the Timber Lake Liberty Dam ("the Dam") in the 1950s. In the 1970s, the land around the Lake was subdivided and homes were built thereon. A document entitled "Lake Restrictions" was created in 1976, and recorded in the chain of title for each subdivided lot. The Lake Restrictions govern the use of the Lake and grant "Shoreline and lake owners, their families and guest * * * full and exclusive rights to freely use all water area of Timber Lake in such manner as not to interfere with use by other lake front owners."

**{¶3}** The Lake Restrictions further provide:

No underwater property line shall be defined or structure erected in such a way as to limit use of water except within forty feet of owners shoreline. All other regulations, rules, improvements and control of every

sort, pertaining to the lake and its' improvements, not in conflict with the above, shall be exclusively the responsibility of the Timber Lake Water Council, consisting only of shoreline and water owners and the owner of the dam embankment whether or not a shoreline or water owner.

Each member of the Timber Lake Water Council shall be equal in authority and responsibility except on items requiring monetary expenditure based on shoreline footage owned, in which case any owner of 300 feet or more of shoreline shall have two votes. No assessment shall be made based on amount or proportion of water area owned.

**{¶4}** In the past, Shoreline Owners voluntarily paid what they could afford to pay for sediment clean up, algae treatment, and other lake-related maintenance. The prior owner of the property which is now owned by 1690 Timber Lake assumed the majority of these costs. Some Shoreline Owners never paid for lake maintenance. The Water Council never conducted regular meetings and did not operate like a homeowners' association. The Water Council never imposed mandatory assessments or annual fees on the Shoreline Owners.

Ownership of 1690 Timber Lake Drive

**{¶5}** The property at 1690 Timber Lake Drive was originally purchased by Timber Lake-Liberty on June 19, 2009. On October 26, 2011, Timber Lake-Liberty transferred its interest to the Judith D. Hook Revocable Trust, dated December 15, 1998, as amended and restated ("the Hook Trust"). On October 18, 2018, the Hook Trust transferred the

property to 1690 Timber Lake. The sole member of 1690 Timber Lake is the Hook Trust. Judith Hook served as the trustee until her death in November, 2021.

**{¶6}** 1690 Timber Lake owns the property along the southern side of the Lake. Until 2010, the 1690 Timber Lake property was two parcels, which were separately owned. In late 2009, an affiliate of 1690 Timber Lake purchased the part of the property which included the upstream portion of the Dam. On October 21, 2010, through a series of transactions involving affiliates of 1690 Timber Lake, the part of the property which included the downstream portion of the Dam was purchased. This transaction is discussed in more detail, infra. The two parcels were combined and are now owned by 1690 Timber Lake. 1690 Timber Lake is a Shoreline Owner and the sole Dam Embankment Owner.

Ownership of 1678 Timber Lake Drive

**{¶7}** On October 21, 2010, Vicki Logan, as trustee of the Vicki G. Logan Revocable Trust ("Logan"), sold the downstream lower dam property located at 1678 Timber Lake Drive to 1678 Timber Lake, LLC ("1678 Timber Lake"). The sole managing member of 1678 Timber Lake is the Hook Trust. 1678 Timber Lake transferred the 1678 Timber Lake Drive property to Timber Lake-Liberty on October 26, 2011. On the same day, Timber Lake-Liberty transferred the 1678 Timber Lake Drive property to the Hook Trust, which unified the said property with the property at 1690 Timber Lake Drive, forming a single parcel. On October 4, 2018, the Hook Trust transferred the combined property of 1678 Timber Lake Drive and 1690 Timber Lake Drive to 1690 Timber Lake.

Inspections of the Dam by Ohio Department of Natural Resources

**{¶8}** In 2009, after learning of the existence of the Dam, the Ohio Department of Natural Resources ("ODNR") conducted the first inspection of the Dam. In 2009 and 2011, ODNR sent letters to 1690 Timber Lake setting forth its findings and advising of the deficiencies found with the Dam. In early 2011, 1690 Timber Lake made several alterations to the property around the Dam, including the installation of a culvert in the spillway, construction of a driveway over the culvert, erection of a fence across the Dam, placement of metal stakes upstream from the drain inlet, and creation of an artificial waterfall near the new driveway.

**{¶9}** In 2014, ODNR again inspected the Dam and issued a Notice of Violation. ODNR sent the inspection report to 1690 Timber Lake, requiring 1690 Timber Lake to complete the required remedial work to bring the Dam into compliance. ODNR conducted another inspection in 2016. In 2018 and 2019, ODNR issued Chief's Orders, again requiring 1690 Timber Lake to bring the Dam into compliance with state law. The 2019 Chief's Order was an agreed order between ODNR and 1690 Timber Lake, approving an emergency action plan for remediating the deficiencies in the Dam, which ODNR identified during the 2014 inspection.

**{¶10}** In December, 2019, and January, 2020, 1690 Timber Lake asked the Shoreline Owners to pay a share of the cost of either remediating the Dam or removing it and draining the Lake. Removal of the Dam was the less expensive option. The Shoreline Owners refused to pay any portion of the cost of remediation of the Dam or removal of the Dam. The Dam remains non-compliant with state law and with the Chief's Orders.

Procedural History

**{¶11}** On February 28, 2020, 1690 Timber Lake filed a complaint for declaratory judgment, seeking a declaration of the rights and obligations of the parties under the Lake Restrictions, and naming CAK Ventures ("CAK"); Kimberly L. Costanzo, Trustee of the Michael G. Fleniken Testamentary Trust, effective date March 1, 2016;[1] Patti Gilcrest; Gregory and Janet Bates ("Bates"); and Kip and Amy Meyers ("Meyers") (collectively, "the Shoreline Owners") as defendants. Specifically, 1690 Timber Lake sought a declaration the Shoreline Owners did not have a right to require 1690 Timber Lake to maintain the Dam or, alternatively, the Lake Restrictions required the Shoreline Owners to contribute to the maintenance of the Dam. On April 8, 2020, 1690 Timber Lake filed a separate complaint for declaratory judgment, seeking a declaration of the rights and obligations of 1690 Timber Lake and Yogesh and Leena Khandelwal (the Khandelwals") under the Lake Restrictions (Delaware County Court of Common Pleas Case No. 20 CV H 04 0177). Via Judgment Entry filed April 29, 2020, the trial court consolidated the two cases.

**{¶12}** On or about September 29-20, 2020, Frank Hook, on behalf of 1690 Timber Lake, drained the Lake by approximately eight feet from its normal level. On October 9, 2020, the Shoreline Owners filed a motion for temporary restraining order and preliminary injunction. Via Judgment Entry filed October 9, 2020, the trial court granted the Shoreline Owners' motion for temporary restraining order. The trial court conducted a hearing on the preliminary injunction on November 4, 2020. Via Judgment Entry filed November 6, 2020, the trial court granted the Shoreline Owners' request for preliminary injunction and

---

[1] Norbert D. Gorman filed an answer as the Successor Trustee of the Michael G. Fleniken Testamentary Trust, effective date March 1, 2016. 1690 Timber Lake subsequently filed a Notice of Voluntary Dismissal of Gorman.

enjoined 1690 Timber Lake from draining the Lake, breaching the Dam, or "taking any other action that would alter the lake, the dam, or the surrounding topography so as to remove water from or lower the level of the lake any further." November 6, 2020 Judgment Entry at p. 4.

{¶13} On February 23, 2021, the Shoreline Owners filed a counterclaim and third-party complaint against 1690 Timber Lake, Judith Hook, Frank Hook, Logan, and Timber Lake-Liberty. The Shoreline Owners claimed 1690 Timber Lake and Judith Hook violated the Lake Restrictions by taking the unilateral action of installing metal stakes and draining the Lake without the approval of the Water Council, and such actions detrimentally impacted the Lake. The Shoreline Owners further alleged 1690 Timber Lake trespassed on their common-law property rights, and 1690 Timber Lake, Judith Hook, Frank Hook, and Logan trespassed on their littoral rights. The Shoreline Owners also sought a declaration Frank Hook, the Hook Trust, 1690 Timber Lake, and Timber Lake-Liberty were alter-egos, and 1690 Timber Lake, Timber Lake-Liberty, and Frank Hook waived their rights to contribution for maintenance costs for the Dam by draining the Lake and acting outside the authority of the Water Council. Additionally, the Shoreline Owners sought a declaration 1690 Timber Lake's deed was invalid as Logan sold the 1678 Timber Lake Drive property to 1678 Timber Lake, which the Shoreline Owners maintain did not exist as a legal entity at the time of the transfer.

{¶14} On March 1, 2021, 1690 Timber Lake and Timber Lake-Liberty filed a motion to dismiss the Shoreline Owners' counterclaim and third-party complaint, and 1690 Timber Lake filed a motion for judgment on the pleadings. The Shoreline Owners filed memorandum contra the motion to dismiss and motion for judgment on the pleadings

on March 30, 2021. The Shoreline Owners also filed a notice of partial dismissal of Logan on the same day. On April 30, 2021, 1690 Timber Lake filed a supplemental complaint, seeking damages under its claimed right of contribution for maintenance expenses relative to the Dam incurred during the pendency of the case. Via Judgment Entry filed August 2, 2021, the trial court denied 1690 Timber Lake and Timber Lake-Liberty's joint motion to dismiss and 1690 Timber Lake's motion for judgment on the pleadings.

{¶15} On February 28, 2022, the Shoreline Owners filed a motion for summary judgment on all of 1690 Timber Lake's claims against them and on their counterclaims and third-party claims against 1690 Timber Lake. Also, on February 28, 2022, 1690 Timber Lake, Timber Lake-Liberty, and Frank Hook moved for partial summary judgment, asking the trial court to declare the basic legal obligations owed by the Shoreline Owners. 1690 Timber Lake also moved for summary judgment on the Shoreline Owners' affirmative defenses of waiver, laches, and estoppel as well as their claims against Frank Hook. In addition, 1690 Timber Lake sought summary judgment and a declaration that its deed to the property at 1678 Timber Lake Drive is valid.

{¶16} Via Judgment Entry filed May 24, 2022, the trial court granted, in part, and denied, in part, the Shoreline Owners' motion for summary judgment; and granted, in part, and denied, in part, 1690 Timber Lake, Timber Lake-Liberty, and Frank Hook's motion for partial summary judgment. The trial court found the Lake Restrictions did not require the permanence of the Lake and 1690 Timber Lake could drain the Lake without violating the Lake Restrictions. The trial court also found the Water Council did not have exclusive control over the Dam and the Lake Restrictions did not require the Shoreline Owners to contribute to the maintenance of the Dam. The trial court determined, because the Lake

Restrictions did not govern the Dam, 1690 Timber Lake's claim for contribution failed as a matter of law.

{¶17} It is from this judgment entry, Appellants appeal, raising the following assignments of error:

I. THE TRIAL COURT ERRED AS A MATTER OF LAW IN FAILING TO RECOGNIZE THAT APPELLANTS HAVE THE BENEFIT OF RECIPROCAL EASEMENTS THAT EACH SHORELINE OWNER ENJOYS OVER THE PROPERTY OF THE OTHER SHORELINE OWNERS THAT REQUIRE TIMBER LAKE TO BE MAINTAINED IN PERMANENCE.

II. THE TRIAL COURT ERRED AS A MATTER OF LAW WHEN IT FAILED TO RECOGNIZE THAT THE TIMBER LAKE SHOULD BE CONSIDERED LEGALLY PERMANENT AND ITS WATER LEGALLY PROTECTED.

III. THE TRIAL COURT ERRED AS A MATTER OF LAW IN HOLDING THAT THE LAKE RESTRICTIONS GRANT NO RIGHT AGAINST INTERFERENCE BY APPELLEE WITH TIMBER LAKE.

IV. THE TRIAL COURT ERRED AS A MATTER OF LAW BY HOLDING THAT: (1) APPELLEE MAY BREACH THE TIMBER LAKE DAM, AND (2) IN ORDER TO PREVENT A BREACH, THE SHORELINE OWNERS MUST PAY FOR REMEDIATION.

V. THE TRIAL COURT ERRED BY FAILING TO ADDRESS THE CAUSE OF ACTION FOR FLOODING IN NOVEMBER 2017 WHEN THE JUDITH HOOK TRUST OWNED THE TIMBER LAKE DAM.

VI. THE TRIAL COURT ERRED IN HOLDING THAT FRANK HOOK BEARS NO RESPONSIBILITY FOR DRAINING TIMBER LAKE.

{¶18} 1960 Timber Lake has filed a conditional cross-appeal, raising the following cross-assignments of error:

I. IF THIS COURT FINDS THAT THE TRIAL COURT ERRED WHEN IT HELD THAT THE PRESCRIPTIVE RECIPROCAL EASEMENT DOES NOT INCLUDE A SERVIENT DAM OWNER'S OBLIGATION TO PAY FOR THE DAM, THE TRIAL COURT SHOULD ALSO BE REVERSED BECAUSE IT ERRED BY DISREGARDING THE HOLDING IN *PETER V. CASWELL*.

II. IF THIS COURT FINDS THAT THE TRIAL COURT ERRED AND SHOULD HAVE FOUND THE LAKE RESTRICTIONS OR SOME OTHER SOURCE GRANTS EACH SHORELINE OWNER THE RIGHT TO COMPEL A REPAIR OF THE DAM (RATHER THAN REPAIR IT THEMSELVES), THE TRIAL COURT ALSO ERRED TO THE EXTENT IT HELD THAT "TIMBER LAKE'S CLAIM FOR CONTRIBUTIONS FAILS AS A MATTER OF LAW."

*Standard of Review*

**{¶19}** Summary judgment proceedings present the appellate court with the unique opportunity of reviewing the evidence in the same manner as the trial court. *Smiddy v. The Wedding Party, Inc.*, 30 Ohio St.3d 35, 36, 506 N.E.2d 212 (1987). As such, this Court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996).

**{¶20}** Civ.R. 56 provides summary judgment may be granted only after the trial court determines: 1) no genuine issues as to any material fact remain to be litigated; 2) the moving party is entitled to judgment as a matter of law; and 3) it appears from the evidence that reasonable minds can come to but one conclusion and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party. *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 364 N.E.2d 267 (1977).

**{¶21}** It is well established the party seeking summary judgment bears the burden of demonstrating no issues of material fact exist for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment is delineated in *Dresher v. Burt*, 75 Ohio St.3d 280 at 293, 662 N.E.2d 264 (1996): "* * * a party seeking summary judgment, on the ground that the nonmoving party cannot prove its case, bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims. The moving party cannot discharge its initial burden under Civ.R. 56 simply by making a conclusory assertion the nonmoving party has no evidence to prove its case.

Rather, the moving party must be able to specifically point to some evidence of the type listed in Civ.R. 56(C) which affirmatively demonstrates the nonmoving party has no evidence to support the nonmoving party's claims. If the moving party fails to satisfy its initial burden, the motion for summary judgment must be denied. However, if the moving party has satisfied its initial burden, the nonmoving party then has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing there is a genuine issue for trial and, if the nonmovant does not so respond, summary *149 judgment, if appropriate, shall be entered against the nonmoving party." The record on summary judgment must be viewed in the light most favorable to the opposing party. *Williams v. First United Church of Christ*, 37 Ohio St.2d 150, 309 N.E.2d 924 (1974).

## I, II, III

**{¶22}** Because Appellants' first, second, and third assignments of error are interrelated, we shall address them together.  In their first assignment of error, Appellants assert the trial court erred in failing to recognize the benefit of the reciprocal easements they and each Shoreline Owner enjoy over the property of other Shoreline Owners, requiring the Lake be maintained in permanence.   In their second assignment of error, Appellants contend the trial court erred in failing to recognize the Lake as legally permanent and its water legally protected.  In their third assignment of error, Appellants submit the trial court erred in holding the Lake Restrictions grant no right against interference by 1690 Timber Lake with the Lake.

**{¶23}**  In their Brief to this Court, Appellants argued:

[A]s Shoreline Owners, [they] have the right to insist that [1690 Timber Lake] (also a Shoreline Owner) maintain the water of Timber Lake over its portion of the Timber Lake reservoir to maintain Timber Lake at its established quasi-natural level. As such reciprocal easements exist as a matter of law, *they are not subject to on-going reciprocal cost or contribution to maintain them*.

Accordingly, all of the Shoreline Owners have a right to insist that their neighbor Shoreline Owners refrain from taking any action inconsistent with the responsibility to maintain water of an amount over their portion of the Timber Lake reservoir to maintain the established water level.

* *

[The trial court's] conclusion [no dam-created lake is permanent] seems untenable as the Lake Restrictions reinforce such legal permanence, affirmatively granting water surface rights. The Lake Restrictions further reinforce the permanence and availability of the lake and the attendant lake water surface rights * * * Accordingly, the Lake Restrictions contain *an affirmatively deeded grant of rights* to the lake's water surface, expressing the permanent nature of the lake. The Lake Restrictions further affirmatively disavow recognition of any underwater property line, establishing the permanent nature of the lake over those property lines, as against any interference by any Shoreline Owner.

Brief of Appellants at 17-19. (Emphasis in original).

**{¶24}** In its May 24, 2022 Judgment Entry, the trial court concluded:

While the Lake Restrictions are enforceable and binding on 1690 Timber Lake and [the Shoreline Owners], nothing in those restrictions require the Lake to be permanently maintained as a water feature, and nothing in those restrictions requires [the Shoreline Owners] to contribute to the costs of repairing the Dam.

*Id.* at p. 11.

**{¶25}** After analyzing the law applicable to restrictive covenants, the trial court found:

[The Shoreline Owners] contend that the surface rights granted to them in the first paragraph of the Lake Restrictions require the permanence of the Lake. * * * The Lake Restrictions mandate that a Shoreline Owner cannot "interfere" with the rights of other Shoreline Owners to use the surface of the Lake. I must consider whether 1690 Timber Lake can take action involving the Dam that would drain the Lake without running afoul of the Lake Restrictions or whether that action would "interfere" with [the Shoreline Owners'] surface rights.

The Lake Restrictions unambiguously confer an easement upon all Shoreline Owners for the use of the undivided surface of the Lake and prohibit Shoreline Owners from interfering with the use of the surface of the

Lake by others. The Lake Restrictions do not, however, guarantee that there will always be a lake to use. Any number of events could result in the lowering the level of the Lake or the complete destruction of the Lake, many of which are outside the control of the parties. * * *

Further, the use of the word "interfere" in the first paragraph refers to interfering with the "use" of the "water area." It is a stretch to contend that 1690 Timber Lake would interfere with the Shoreline Owners' use of the water area of the Lake by breaching the Dam, which lies exclusively on 1690 Timber Lake's property. In any event, even were I to conclude that the term "interfere" is ambiguous as used in the first paragraph of the Lake Restrictions, that provision would be unenforceable as a restriction on 1690 Timber Lake's use of its property because ambiguous restrictive covenants are given the meaning that promotes free and unrestricted use of the land. I conclude, therefore, that nothing in the Lake Restrictions requires 1690 Timber Lake to maintain the Dam to ensure the permanent existence of the Lake.

Id. at 13-14.

{¶26} While we may disagree with the trial court's conclusion "[i]t is a stretch to contend that 1690 Timber Lake would interfere with the Shoreline Owners' use of the [then-existing] water area of the Lake by breaching the Dam, which lies exclusively on 1690 Timber Lake's property," we agree with the trial court's finding the term "interfere" is ambiguous. In context, the use of the term "interfere" implies a volitional act by the

Dam Owner, 1690 Timber Lake. Here, repair of the dam resulting in lowering or draining of the Lake are necessitated by the Chief's Orders issued by ODNR, not by 1690 Timber Lake's own doing. Arguably, it is the state of Ohio which has interfered with the Shoreline Owners' or Dam Owner's use of the Lake. Such state action was not contemplated by either the Shoreline Owners or the Dam Owner at the time the Lake Restrictions were created or the responsibilities of the Water Council were determined.

{¶27} In any event, we agree with the trial court's analysis of the impact of the ambiguity associated with the use of the term "interfere" in the Lake Restrictions. We conclude, as did the trial court, nothing in the Lake Restrictions required 1690 Timber Lake to maintain the Dam to ensure the permanent nature of the Lake.

{¶28} Appellants' first, second, and third assignments of error are overruled.

IV

{¶29} In their fourth assignment of error, Appellants submit the trial court erred in finding 1690 Timber Lake may breach the Dam, and in finding the Shoreline Owners "must pay for remediation" in order to prevent a breach. Appellants further assert the prescriptive easement granted by the trial court is inequitable.

{¶30} Specifically, Appellants maintain, as Shoreline Owners, they hold an irrevocable easement in the lake, and 1690 Timber Lake, as the Dam owner, should repair, not breach, the Dam as breaching the Dam will adversely impact the Shoreline Owners. In support of their position, Appellants rely upon two cases decided under Georgia law: *Forsyth County v. Martin*, 279 Ga. 215, 610 S.E.2d 512 (2005); and *Bishop Eddie Long Ministries, Inc. v. Dillard*, 272 Ga. App. 894, 613 S.E.2d 673 (2005). We find these cases to be factually distinguishable.

{¶31} In *Forsyth County v. Martin*, the Supreme Court of Georgia addressed the property interests of lakefront property owners in relation to an earthen dam, which had been built to create a 21-acre lake as part of the residential community. *Id*. at 215. The developer constructed residential homesites bordering the lake, which were sold pursuant to a recorded plat depicting the lake area. *Id*. Forsyth County was directed to determine whether it would breach or repair the dam due to concerns the dam was in danger of complete failure. *Id*. at 215-216. The lakefront property owners filed an action against Forsyth County, seeking a declaration Forsyth County owned the dam; therefore, was responsible for its maintenance and repair. *Id*. at 216.

{¶32} In affirming the trial court's directed verdict against Forsyth County, the Supreme Court of Georgia determined the lakefront property owners acquired an irrevocable easement in the lake. *Id*. at 217. The Court reasoned the property owners purchased their lots according to a recorded subdivision plat which showed the lake area, and the property owners paid more for their lakefront lots, thereby acquiring an irrevocable easement in the lake. *Id*. The Georgia Supreme Court concluded "[t]he homeowners' interest in the lake limited the legal ability of the County, as owner of the dam ... to breach the dam." *Id*.

{¶33} In *Bishop Eddie Long Ministries, Inc. v. Dillard*, 272 Ga. App. 894, 613 S.E.2d 673 (2005), upper riparian landowners brought a nuisance and trespass action against lower riparian landowner regarding a dam-created lake which the lower riparian landowner drained. *Id*. at 894. The property on which the dam sat was owned by the lower riparian landowner. *Id*. The lower riparian landowner counterclaimed for trespass, conversion, and nuisance. *Id*. The trial court found, inter alia, the upper riparian

landowners had an irrevocable easement to the lake; therefore, could maintain both trespass and nuisance claims against the lower riparian landowner. *Id.* at 897. Both the upper and lower riparian landowners appealed. *Id.* at 894.

**{¶34}** The Georgia Court of Appeals addressed the easement rights of property owners in relation to the lake. *Id.* In analyzing the easement rights of the parties, the Georgia Court of Appeals applied common grantor method principles and concluded because the purchaser (one of the upper riparian landowners) bought his property from the lake owner (the lower riparian landowner) pursuant to a recorded plat which depicted the lake, the purchaser acquired an irrevocable easement in the lake. *Id.* at 898 .

**{¶35}** In both of these cases, the property owners acquired irrevocable easements in the respective lakes because they purchased their properties pursuant to recorded plats which depicted the lakes. Appellant herein did not advance such a legal theory in the trial court. In their motion for summary judgment, Appellants and the other Shoreline Owners argued an implied easement arose from the Lake Restrictions. A party appealing a summary judgment ruling cannot advance new theories or raise new issues in order to secure reversal on appeal. *Whitson v. One Stop Rental Tool & Party*, 12th Dist. Preble No. CA2016–03–004, 2017-Ohio-418, 84 N.E.3d 84, ¶ 17. Accordingly, we need not determine whether Appellants acquired irrevocable easements.

**{¶36}** Within this assignment of error, Appellants also argue the prescriptive easement granted by the trial court is inequitable. Appellants submit 1690 Timber Lake will benefit from the continued existence of the Lake if Appellants and the Shoreline Owners exercise their prescriptive easement to remediate the Dam "at no cost to [1690 Timber Lake." Brief of Appellants at 23. Appellants and the Shoreline Owners have

insisted throughout the course of this litigation 1690 Timber Lake alone should bear the cost of maintaining the Dam at no cost to Appellants and the other Shoreline Owners. Appellants did not present this alternative argument to the trial court; therefore, has waived on appeal. *The Strip Delaware, LLC v. Landry's Restaurants, Inc.,* 5th Dist. Stark No. 2010CA00316, 2011-Ohio-4075, 2011 WL 3587455, ¶ 41.

**{¶37}** Appellants' fourth assignment of error is overruled.

V

**{¶38}** In their fifth assignment of error, Appellants maintain the trial court erred in failing to address their cause of action for damages caused by flooding in November, 2017, when the Hook Trust owned the Dam.

**{¶39}** "A ruling on a motion for summary judgment need not state the findings of fact or conclusions of law." *Funk v. Handcock*, 26 Ohio App.3d 107, 108, 498 N.E.2d 490 (1985). See, also, Civ. Rule 52, which states: "Findings of fact and conclusions of law required by this rule and by ... are *unnecessary upon* all other motions including those pursuant to Rule 12, Rule 55 and *Rule 56.*" *Id*. at para. 3 (Emphasis added). Indeed, a "trial court need not enunciate any definitive statement concerning the court's rationale for ruling on a motion for summary judgment but need only issue 'a clear and concise pronouncement of the judgment' and 'a sufficient pronouncement of its decision upon which to review the issues raised by appellants' appeal.'" *State ex rel. Ames v. Pokorny*, 11th Dist. Portage No. 2022-P-0007, 2022-Ohio-1102, ¶ 3, quoting *Rogoff v. King*, 91 Ohio App.3d 438, 449, 632 N.E.2d 977 (8th Dist.1993).

**{¶40}** In 1690 Timber Lake, Timber Lake-Liberty, and Frank Hook's motion for partial summary judgment, Frank Hook asserted, "Summary judgment should be granted

as to Frank Hook. Otherwise, Mr. Hook needs to know . . . for what specific act or acts he is alleged to be responsible and for which the Shoreline Neighbors can proceed in front of a jury on. Motion for Summary Judgment at 19. Frank Hook specifically challenged Gilcrest's claim for damages resulting from a 2017 flood, arguing, "Patty Gilcrest seeks approximately $6,000 for damages for repair to a dock and steps. There is no evidence as to how that was or could have been caused or prevented by Frank Hook." *Id.*

{¶41} In its May 24, 2022 Judgment Entry, the trial court found, "Frank Hook is entitled to summary judgment on *all claims against him* because he is not the alter ego of 1690 Timber Lake and because he is not otherwise personally liable." *Id.* at p.22 (Emphasis added). While the trial court did not specifically enunciate its rationale for finding in favor of Frank Hook on Appellants' cause of action for flooding, the trial court did address the claim.

{¶42} Appellants' fifth assignment of error is overruled.

VI

{¶43} In their final assignment of error, Appellants posit the trial court erred in finding Frank Hook bore no responsibility for draining the Lake because they "were unable to demonstrate facts sufficient to 'pierce the corporate veil.'" Brief of Appellants at p. 24. Appellants explain Frank Hook was not an officer, director, or shareholder of 1690 Timber Lake; therefore, he "cannot insulate himself from liability simply by claiming his actions were done for someone else" and "is not free of personal liability." *Id.* at p. 25.

{¶44} In its May 24, 2022 Judgment Entry, the trial court conducted a thorough analysis in determining Frank Hook was not the alter ego of 1690 Timber Lake and did not bear any personal liability. The trial court stated, in pertinent part:

An individual owner, shareholder, director, or officer is not liable for the debts of a legal entity, including an LLC. * * * The "corporate veil" may be pierced in "rare exceptions" where: (1) control over the entity is so complete that the entity has no separate mind, will, or existence; (2) the person exercised control over the entity to commit fraud, an illegal act, or a similarly unlawful act; and (3) injury resulted from the person's control. * * * The second prong requires more than an unjust or inequitable action and instead requires proof of an *egregious* wrong, such as illegal conduct. * * *

Mr. Hook did not do anything that would destroy the legal separation between himself and 1690 Timber Lake as a separate legal entity. Mr. Hook is not even a member or manager of 1690 Timber Lake. * * * The Hook Trust is the sole member and manager of 1690 Timber Lake, Timber Lake-Liberty, and 1678 Timber Lake. * * * Judith Hook, as the then-trustee of the Hook Trust, made all decisions concerning the Dam until her death in November 2021. * * *

* * Defendants do not have any evidence, and do not even contend, that Mr. Hook acted outside the scope of his authority as an agent of 1690 Timber Lake and the authority delegated to him by its member, Judith Hook, as trustee of the Hook Trust.

* *

Defendants further allege that Mr. Hook stated in December 2019 that he had Mr. Bates's proxy to vote to drain the Lake and that this untruthful claim supports piercing the corporate veil. Even if this alleged misstatement rose to the level of fraud for purposes of piercing the corporate veil, however, Defendants cannot show that they were injured as a result. Defendants did not vote to contribute to the repair costs of the Dam and did not vote to drain the Lake in reliance on the false claim that the Bateses were in agreement with Mr. Hook. Rather, Defendants continued to dispute 1690 Timber Lake's right to contribution and continued to demand that 1690 Timber Lake remediate the Dam at its sole cost. Any attempt to pierce the corporate veil based on this alleged misrepresentation fails as a matter of law.

* *

Simply put, Mr. Hook's alleged actions, even if assumed to be true, do not establish he was the alter ego of 1690 Timber Lake.

* *

There is no evidence before me that Mr. Hook did anything regarding the Lake or the Dam that could support a claim against him personally. * * * Mr. Hook testified about the scope of his authority as an agent of 1690 Timber Lake. * * * Mr. Hook had authority to call and attend meetings on 1690 Timber Lake's behalf, deal with contractors, and order work to be done. * * * Any actions he took in meeting with others or working with

contractors was done on behalf of 1690 Timber Lake, and Judith Hook made or approved each of those decisions. * * * Mr. Hook denied having any authority on behalf of 1690 Timber Lake to file a lawsuit or make decisions regarding alterations to its real property.

*Id.* at 23- 28. (Citations omitted.  Emphasis in original).

**{¶45}** Upon review of the entire record in this matter, we agree with the trial court and find Frank Hook did not bear personal liability for any decisions regarding 1690 Timber Lake property.

**{¶46}** Appellants' sixth assignment of error is overruled.

**{¶47}** Having overruled Appellants' assignments of error, 1690 Timber Lake's conditional cross-appeal is rendered moot. The judgment of the Delaware County Court of Common Pleas is affirmed

By: Hoffman, P.J.

Baldwin, J.  and

King, J. concur